Argued and submitted October 20, 2004, decision of Court of Appeals reversed, and
case remanded to that court for further proceedings October 12, 2006

Scott Thomas KELLAS,
*Respondent on Review,*

*v.*

DEPARTMENT OF CORRECTIONS
and Criminal Justice Commission,
*Petitioners on Review.*

(CA A118362, SC S51378)

145 P3d 139

Erika L. Hadlock, Assistant Attorney General, Salem, argued the cause and filed the briefs for petitioners on review. With her on the briefs were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Denise Fjordbeck, Assistant Attorney General.

No appearance *contra*.

Before Carson, Chief Justice,** and Gillette, Durham, Riggs,*** De Muniz,**** Balmer, and Kistler, Justices.*****

DURHAM, J.

---

** Chief Justice when case was argued.

*** Riggs, J., retired September 30, 2006, and did not participate in the decision of this case

**** Chief Justice when case was decided.

***** Walters, J., did not participate in the consideration or decision of this case.

## DURHAM, J.

This is a case of judicial review of administrative rules. Petitioner below (respondent on review) Kellas[1] challenges the lawfulness of two administrative rules under ORS 183.400, which provides, in part, that "[t]he validity of any rule may be determined upon a petition by *any person* to the Court of Appeals[.]" (Emphasis added.) The Court of Appeals declined to reach the merits of petitioner's arguments because it concluded that petitioner lacked standing to challenge the rules in question. The Court of Appeals dismissed the petition. We reverse.

We take the pertinent facts from the record and the opinion of the Court of Appeals. Petitioner is the father of an adult son, Brian Kellas. Police arrested and charged Brian with robbery and burglary, among other charges. Subsequently, Brian executed and the court approved a security release agreement in which Brian agreed that he would be on "house arrest" during the pendency of his case. That term of the agreement compelled Brian to remain at his parents' home; it permitted him to leave the home only if a parent accompanied him or if he left to attend to his job, his classes, or to visit his health club. Brian's house arrest lasted for 311 days.

Brian pleaded guilty to robbery and burglary charges. The court sentenced him, among other conditions, to prison for 36 months on each offense, with 12 months of the burglary sentence to run concurrently with the robbery sentence and the remaining 24 months to run consecutively to the robbery sentence, for a total of 60 months. The court committed Brian to the custody of the Department of Corrections (DOC). The DOC calculated Brian's prison term, but did not give Brian credit against his prison term for the 311 days that he spent on house arrest in compliance with his pretrial security release agreement.

---

[1] In this opinion, we refer to Scott Thomas Kellas by his designation in the proceeding below, "petitioner."

In refusing to grant time served credit to Brian for the time he spent on house arrest, DOC relied on its interpretation of two administrative rules: OAR 213-005-0012(2)(d) and OAR 291-100-0080. The first is a rule that the Criminal Justice Commission (CJC) has promulgated. In a series of administrative rules, the CJC has specified the length of a term of incarceration that will result from a sentence imposed in a judgment of conviction. In general, the CJC rules distinguish between a sentence of imprisonment and a probationary sentence. The rules also specify the number of "sanction units" that a person sentenced to a term of incarceration must serve. A day spent in various kinds of custodial supervision, incarceration, treatment or release programs may qualify as a "sanction unit." The CJC rules authorize sentencing judges, under specific conditions, to impose sanction units as a part of a probationary sentence. OAR 213-005-0011(3). OAR 213-005-0012(2)(d) provides that, if a court imposes sanction units as part of a probationary sentence, then the offender must receive credit for each day of satisfactory compliance with house arrest. OAR 213-005-0012(2) provides, in part:

> "When sanction units are imposed as part of a probationary sentence, the offender shall receive credit for having served those sanction units as follows:
>
> "* * * * *
>
> "(d) HOUSE ARREST: Each day of satisfactory compliance with the requirements of house arrest equals one (1) sanction unit if the offender satisfactorily completes the house arrest."

However, the DOC asserted that OAR 213-005-0012(2)(d) was inapplicable to the sentence in Brian's case because the court sentenced Brian to imprisonment, not a probationary sentence, and, according to DOC, that rule applies only to probation.

The second rule is one of several rules that DOC has adopted to aid that agency in determining the length of time that it should incarcerate an inmate sentenced to its custody. OAR 291-100-0080 provides, in part, that the DOC must

grant credit to an inmate for time spent in custody before sentencing, such as in a county jail. However, OAR 291-100-0080(7) provides: "An inmate will not receive time served credit for time spent on house arrest or electronic monitoring." DOC declined to grant time served credit to Brian under that rule.

Petitioner filed this challenge under ORS 183.400 to assert that the refusal of DOC to grant time served credit to Brian for the period of his pretrial house arrest, pursuant to the administrative rules discussed above, was unlawful under ORS 137.370(2). That statute provides, in part:

> "Except as provided in subsections (3) and (4) of this section, when a person is sentenced to imprisonment in the custody of the Department of Corrections, for the purpose of computing the amount of sentence served the term of confinement includes only:
>
> "(a) The time that the person is confined by any authority after the arrest for the crime for which sentence is imposed[.]"

Petitioner argued that the trial court had confined Brian to his parents' home prior to trial for 311 days and that ORS 137.370(2)(a) required DOC to grant time served credit for that period of confinement. Petitioner contended that OAR 213-005-0012(2)(d) and OAR 291-100-0080(7) were not valid because, among other grounds, they conflicted with ORS 137.370(2)(a) and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. In connection with the equal protection claim, petitioner asserted that he had a fundamental liberty interest in associating with his son and that the DOC infringed on that interest by maintaining its custody over Brian for 311 days longer than the law would permit.

DOC and CJC (collectively, the state) took no position on whether petitioner had standing to challenge the two administrative rules. Instead, the state confined its dispute with petitioner's rule challenge to the merits. The Court of Appeals raised the issue of petitioner's standing *sua sponte*. That court acknowledged that ORS 183.400 is broadly phrased and appears to confer standing "without regard to whether a petitioner has a personal stake in the validity of a

particular administrative rule." *Kellas v. Dept. of Corrections*, 190 Or App 331, 334, 78 P3d 1250 (2003). The court concluded, however, that, notwithstanding the broad wording of ORS 183.400, petitioner had to demonstrate a personal stake in the outcome of the rule challenge to "meet constitutional justiciability requirements." *Id.* The Court of Appeals stated that

> "a petitioner seeking to challenge a rule under ORS 183.400 must demonstrate that he or she has a legally recognized interest at stake and that the relief sought—validation or invalidation of an administrative rule—would have a practical effect on that interest."

*Id.* The court concluded that petitioner had failed to demonstrate that invalidation of the challenged rules would have a practical effect on petitioner or on his interest in associating with his son. *Id.* at 336. Consequently, the court held that petitioner had no standing to challenge the administrative rules in question. *Id.* at 337.

The Court of Appeals reached that conclusion by relying on its opinion in *Utsey v. Coos County*, 176 Or App 524, 539-40, 32 P3d 933 (2001), in which the Court of Appeals elaborated on an identical holding in a similar context.[2]

■        The state now petitions this court for review of the Court of Appeals decision. The state argues that the legislature lawfully may authorize any person to seek judicial review to challenge the validity of a governmental action, such as an administrative rule, without a showing that the governmental action or the court's decision will have a practical effect on that person's individual rights or interests. We granted review and, for the reasons expressed below, conclude that, at least within the context of the present controversy, the state's argument is correct.

■        "Standing" is a legal term that identifies whether a party to a legal proceeding possesses a status or qualification

---

[2] This court allowed review in *Utsey* but later dismissed the petitions for review when the underlying controversy became moot. *See Utsey v. Coos County*, 335 Or 217, 65 P3d 1109 (2003) (order dismissing petitions for review due to mootness).

necessary for the assertion, enforcement, or adjudication of legal rights or duties.[3] *See Eckles v. State of Oregon*, 306 Or 380, 383, 760 P2d 846 (1988) (discussing principle). A party who seeks judicial review of a governmental action must establish that that party has standing to invoke judicial review. The source of law that determines that question is the statute that confers standing in the particular proceeding that the party has initiated, "because standing is not a matter of common law but is, instead, conferred by the legislature." *Local No. 290 v. Dept. of Environ. Quality*, 323 Or 559, 566, 919 P2d 1168 (1996).

As noted, ORS 183.400(1) provides that "[t]he validity of *any rule* may be determined upon a petition by *any person* to the Court of Appeals[.]" (Emphasis added.) The statute imposes no additional qualification for standing in this context.

The legislature's policy choice regarding standing in ORS 183.400(1) is unambiguous. The legislature intends by the statute to authorize any person to invoke the judicial power of the court to test the validity of every administrative rule under existing statutory and constitutional law and, thus, to advance the objective that all agency rulemaking shall remain within applicable procedural and substantive legal bounds. So understood, petitioner satisfies the standing requirement that ORS 183.400(1) identifies. The remaining question is whether some other source of law—in this case, the Oregon Constitution—imposes any additional requirement or limitation regarding a party's standing to challenge an administrative rule. To address that question, we examine first the scope of the constitutional authority of the legislature to enact ORS 183.400(1) and, second, the authority of an Oregon court, consistent with the conception of the

---

[3] Unlike the concepts of ripeness and mootness, which inquire about whether litigation has occurred too soon or too late (*i.e.*, they ask the question "when?"), standing asks the question "who?" Elaborating on that point, Justice Antonin Scalia has commented: "In more pedestrian terms, [standing] is an answer to the very first question that is sometimes rudely asked when one person complains of another's actions: 'What's it to you?' " Antonin Scalia, *"The Doctrine of Standing as an Essential Element of the Separation of Powers,"* 17 Suffolk U L Rev 881, 882 (1983).

judicial power that we find in the Oregon Constitution, to entertain a challenge to administrative rules under ORS 183.400(1).

The lawmaking authority of Oregon's legislature under the Oregon Constitution is plenary, subject only to limits that arise either from the Oregon Constitution or from a source of supreme federal law. We are aware of no qualification on the legislature's authority in the Oregon Constitution that would restrict the legislature from authorizing any member of the public to initiate litigation concerning the validity of administrative rules under a statute such as ORS 183.400(1).

The plenary lawmaking authority of the Oregon legislature stands in marked contrast to the limitations that pertain to lawmaking by the United States Congress. For example, in authorizing litigation in the courts of the United States, Congress must respect the limitation in Article III, section 2, of the United States Constitution, which provides that the judicial power of the United States extends to the resolution of "cases" or "controversies." That clause has given rise to an extensive body of federal law regarding the justiciability of disputes in federal court. *See* Lea Brilmayer, *"The Jurisprudence of Article III: Perspectives on the 'Case or Controversy' Requirement,"* 93 Harv L Rev 297 (1979) (reviewing federal jurisprudence of justiciability); Robert J. Pushaw, Jr., *"Article III's Case / Controversy Distinction and the Dual Functions of Federal Courts,"* 69 Notre Dame L Rev 447 (1994) (same).

The Oregon Constitution contains no "cases" or "controversies" provision. Moreover, the United States Supreme Court has determined that "the constraints of Article III do not apply to state courts * * *." *Asarco Inc. v. Kadish,* 490 US 605, 617, 109 S Ct 2037, 104 L Ed 2d 696 (1989). For that reason, we cannot import federal law regarding justiciability into our analysis of the Oregon Constitution and rely on it to fabricate constitutional barriers to litigation with no support in either the text or history of Oregon's charter of government. As former Justice Linde of this court has explained:

> "In sum, rejecting premature or advisory litigation is good policy, but rigid tests of 'justiciability' breed evasions

and legal fictions. It is prudent to keep judicial intervention within statutory or established equitable and common law remedies. It is not prudent to link a decision declining adjudication to non-textual, self-created constitutional barriers, and thereby to foreclose lawmakers from facilitating impartial, reasoned resolutions of legal disputes that affect people's public, rather than self-seeking, interests. Requirements that rest only on statutory interpretations can be altered to meet desired ends, but change becomes harder once interpretations are elevated into supposedly essential doctrines of 'justiciability.' * * *"

Hans A. Linde, *"The State and the Federal Courts in Governance: Vive La Différence!,"* 46 Wm & Mary L Rev 1273, 1287-88 (2005). *See also* Helen Hershkoff, *"State Courts and the 'Passive Virtues': Rethinking the Judicial Function,"* 114 Harv L Rev 1833, 1905 (2001) (concluding that "the concerns that motivate federal justiciability doctrine are not wholly applicable to the theory or practice of state governance.").

We turn next to a consideration whether the Oregon Constitution limits the authority of Oregon's courts to consider a challenge to administrative rules under ORS 183.400(1). As noted, the Court of Appeals concluded in *Utsey* that Oregon courts lack the power to decide any case unless the party invoking the judicial power asserts a personal right or claims a personal injury that a judicial decision will affect in a practical way. We note that this court's discussions of that question have not always been consistent. 176 Or App at 539-40. However, as we shall demonstrate, it follows from the clear weight of authority from this court that the standing element of ORS 183.400(1) poses no obstacle to the lawful exercise of the judicial power by an Oregon court.

Article VII (Amended), section 1, of the Oregon Constitution provides, in part:

"The judicial power of the state shall be vested in one supreme court and in such other courts as may from time to time be created by law."

This court recognized in *Yancy v. Shatzer*, 337 Or 345, 362, 97 P3d 1161 (2004), that the scope of the "judicial power" that Article VII (Amended), section 1, confers is not unlimited. The court observed that the history of that phrase did not

permit a "definitive conclusion regarding the scope of [that] power under the Oregon Constitution" and that the "constitutional grant of judicial power did not include the power to decide cases that had become moot at some stage of the proceedings." *Id.* That holding does not resolve the issue presented in this case, however. Here, the question is whether the legislature has the authority to empower any citizen to act as a private attorney general to enforce public rights.

The premise for the *Utsey* court's holding on that issue is that the absence of personal stake in the rule challenge on the part of petitioner prevents the court from exercising the judicial power—whatever its scope may be—to address the matter, thus elevating the practical effects criterion to a jurisdictional component. However, from the early days of statehood to the present day, our cases undermine that view of the judicial power.

In *State v. Ware*, 13 Or 380, 10 P 885 (1886), the relator sought a writ of mandamus directing the Lane County clerk to correct election notices that failed to state that the office of circuit judge would be filled in the general election. At oral argument, a question arose as to whether the relator had a sufficient interest in the matter to sustain the proceeding, because the case concerned the enforcement of public, not private, rights. *Id.* at 382. The relator had no special interest distinct from that of other members of the community. In nonetheless deciding that the relator had an interest sufficient to sustain his participation in the proceeding, this court agreed that

" 'the decided weight of authority supports the proposition that, where the relief is merely for the protection of private rights, the relator must show some personal or special interest in the subject-matter, since he is regarded as the real party in interest, and his right must clearly appear. On the other hand, where the question is one of public right, and the object of the *mandamus* is to procure the enforcement of a public duty, the people are regarded as the real party; and the relator, at whose instigation the proceedings are instituted, need not show that he has any legal or special interest in the result, it being sufficient to show that he is a citizen, and as such is interested in the execution of the law.' "

*Ware,* 13 Or at 382-83 (emphasis in original) (quoting High, *Legal Remedies* § 431).

*State ex rel. Durkheimer v. Grace,* 20 Or 154, 158, 25 P 382 (1890), supports the same principle:

> "[A]s the question at bar is one of public right, and the object of the mandamus is to enforce the performance of a public duty, the people being regarded as the real parties in interest, it is not necessary that the relators should show any special interest or particular right to be affected by the result."

In *Marbet v. Portland Gen. Elect.,* 277 Or 447, 453-457, 561 P2d 154 (1977), a case brought under the Administrative Procedures Act (APA), ORS 183.310 to 183.750, the Nuclear and Thermal Energy Council (now renamed the Energy Facility Siting Council) admitted petitioner (Marbet) as an intervenor in proceedings in which the council had recommended to the Governor that he issue Portland General Electric Company (PGE) a site certificate for the construction of two nuclear power plants. Marbet sought judicial review of the council's final order. In a cross-petition, PGE raised objections to the council's admission of Marbet as a party to the proceedings. Because the council's decision resulted from a contested case, ORS 183.480 governed judicial review. At the time, ORS 183.480 provided, in part:

> "(1)  Any person adversely affected or aggrieved by any order *or any party to an agency proceeding* is entitled to judicial review of a final order, * * *."

(Emphasis added.)

This court observed that the legislature, in conferring standing on "any party" admitted as such by the agency to its proceeding, entitled the petitioner to judicial review without a further showing of interest. *Marbet,* 277 Or at 453. This court further noted that the legislature envisioned broad public participation in the energy facility siting process itself. *Former* ORS 469.380 provided:

> "(2)  The council may, by proper order, permit any person to become a party complainant or defendant by intervention who appears to have an interest in the results of the

hearing or who represents a public interest in such results
* * *."

This court stated that ORS 469.380

"thus gives no greater procedural weight to an intervenor's personal self-interest than to an interest that he shares with other members of the public. It expresses the legislature's judgment that the important decisions of public policy entrusted to the Energy Facility Siting Council are not to be treated as a dispute between opposing private interests."

*Marbet*, 277 Or at 453-54. The *Marbet* court also concluded that, in ORS 183.480(1), the legislature's conferral of standing on those "aggrieved" by a final order in a contested case, "surely includes one whom the agency itself, pursuant to a statutory directive, has recognized to present an interest that the legislature wished to have considered." *Id.* at 457.[4]

In holding that the petitioner was entitled to judicial review of the council's final order under ORS 183.480, despite his lack of an individualized self-interest in the outcome, this court implicitly recognized that the Oregon Constitution does not limit the legislature's power to deputize its citizens to challenge government action in the public interest. In fact, in *Marbet*, this court held the case to be justiciable even though its decision would have a practical effect only on the respondent, PGE, and not on the petitioner, Marbet, who had invoked the judicial power in the first place.

More recently, in *Brian v. Oregon Government Ethics Commission*, 319 Or 151, 159, 874 P2d 1294 (1994) this court reiterated its *Marbet* holding, stating that "a party to an agency proceeding (other than the agency itself) has standing under ORS 183.480(1) to seek judicial review by that fact alone, without further showing of interest." In that case, the petitioner, a state representative, appealed from a decision of the Oregon Government Standards and Practices

---

[4] For an application in the land use context of the requirement that a petitioner be "adversely affected" or "aggrieved" to petition for agency review, see *Jefferson Landfill Comm. v. Marion Co.*, 297 Or 280, 686 P2d 310 (1984) (concluding that the petitioner was aggrieved because he was an "interested person" under local county ordinance, had appeared before the local body and testified on the merits, and the decision made was contrary to the position he asserted).

Commission (commission), which had rendered a decision exonerating the petitioner of alleged ethics violations. The petitioner was dissatisfied with statements in the commission's final order. The commission moved to dismiss the petitioner's request for judicial review on the ground that he was not "adversely affected or aggrieved" by the final order within the meaning of ORS 183.480. *Id.* at 155. The Court of Appeals dismissed on the ground that the petitioner's lack of standing deprived the court of jurisdiction to hear the case. The petitioner argued to this court that he had standing pursuant to ORS 183.480 as a party to the commission's proceeding and that, under the plain wording of the statute, "a 'party' need not be 'adversely affected or aggrieved by an order' to be 'entitled to judicial review.'" *Id.* The commission agreed that the petitioner was a party to the proceeding under the statute, but argued that even a party has no "'standing * * * when the action taken by the agency is favorable to the party * * *.'" *Brian,* 319 Or at 155-56. After examining ORS 183.480, this court reaffirmed its holding in *Marbet* and disavowed *dictum* from another case, *Cooper v. Eugene Sch. Dist. No. 4J*, 301 Or 358, 723 P2d 298 (1986), to the extent that *Cooper* "suggests that a non-agency party must show any additional interest or adversity to have standing." *Brian,* 319 Or at 159.

Outside the APA, this court has reaffirmed its view in non-APA cases that statutory standing conferred in pursuit of any permissible legislative interest is sufficient to meet any constitutional requirement that might exist. For example, *Deras v. Keisling*, 320 Or 1, 3, 879 P2d 850 (1994), was an original proceeding for judicial review of a ballot measure explanatory statement brought pursuant to ORS 251.235.[5] This court determined that the petitioner had standing merely because he met the broad statutory requirement of being "dissatisfied" with the explanatory statement in question. This court did not explore whether the petitioner

---

[5] ORS 251.235 (1993) provided, in part, that "[a]ny person dissatisfied with an explanatory statement for which suggestions were offered at the Secretary of State's hearing * * * may petition the Supreme Court seeking a different statement and stating the reasons the statement filed with the court is insufficient or unclear."

had a private interest different from that of the general public that would be affected by the decision regarding the proposed ballot measure, because the Oregon Constitution does not require that inquiry.

Finally, in *Oregon Newspaper Publishers v. Dept. of Corrections*, 329 Or 115, 988 P2d 359 (1999), a case brought under ORS 183.400, the petitioners challenged administrative rules regarding the witnessing of executions of prison inmates. This court did not address whether the petitioners had concrete rights that would be practically affected by the outcome of its decision. It simply noted that petitioners met the statutory standing requirement of being "any person," reflecting this court's understanding that the standing inquiry ended there. *Id.* at 118 n 1.

This court's cases from *Ware* to *Oregon Newspaper Publishers* consistently have held that the legislature can recognize the right of any citizen to initiate a judicial action to enforce matters of public interest. That statutory recognition satisfied whatever constitutional requirement may inhere in Article VII (Amended), section 1. The correct question accordingly is not whether Article VII, section 1, requires a personal stake in the proceeding. Rather, the question is whether the legislature has empowered citizens to initiate a judicial proceeding to vindicate the public's interest in requiring the government to respect the limits of its authority under law.

In reaching its contrary conclusion in *Utsey*, the Court of Appeals erroneously relied on decisions in which this court discussed a practical effects requirement in the context of distinguishable statutory standing requirements, such as those in the Uniform Declaratory Judgment Act,[6] ORS 28.010 to 28.160. *See Oregon Cry. Mfgs. Ass'n v. White*, 159 Or 99, 78 P2d 572 (1938) (action brought pursuant to Declaratory Judgment Act held nonjusticiable on ripeness and lack of adversity grounds); *Eacret et ux v. Holmes*, 215 Or 121, 333

---

[6] ORS 28.110 provides, in part:

"When declaratory relief is sought, all persons shall be made parties *who have or claim any interest which would be affected by the declaration* * * *."

(Emphasis added.)

P2d 741 (1958) (plaintiffs had no standing under Declaratory Judgment Act because wrong of which they complained was "public in character"); *Gortmaker v. Seaton*, 252 Or 440, 443, 450 P2d 547 (1969) (plaintiff lacked standing under Declaratory Judgment Act because a decision would not affect his rights); *Cummings Constr. v. School Dist. No. 9*, 242 Or 106, 408 P2d 80 (1965) (plaintiffs failed to show entitlement to declaratory judgment relief because they could not prove they had any present legal rights against the defendant); *Budget Rent-A-Car v. Multnomah Co.*, 287 Or 93, 597 P2d 1232 (1979) (plaintiff had standing under Declaratory Judgment Act because tax would affect its interests in numerous ways).

We acknowledge that three recent decisions from this court may have caused some confusion in the application of statutes conferring standing on persons who do not assert a personal interest in the outcome. In *People for Ethical Treatment v. Inst. Animal Care*, 312 Or 95, 99, 817 P2d 1299 (1991) (PETA), and *Brian*, 319 Or at 156, this court suggested that a reviewing court's inquiry into the standing of an entity seeking judicial review may involve "certain constitutional considerations" beyond an interpretation of legislative intent. This court decided *PETA* and *Brian* on statutory grounds, however. We cannot conclude that this court intended those statements to constitute an authoritative statement of law about any possible constitutional dimension to the standing inquiry.

In the third case, *McIntire v. Forbes*, 322 Or 426, 909 P2d 846 (1996), resident taxpayers of a transportation district challenged the constitutionality of a statute that involved light rail funding. The statute provided that, "[a]ny interested person may petition the Supreme Court for a determination of the constitutionality of any provision of sections 1 to 18 of this Act * * *." Or Laws 1995, ch 3, § 18(2) (Spec Sess). The regional entity responsible for the light rail project intervened, challenging the petition on grounds of statutory and constitutional standing. In its decision, this court determined first that petitioners satisfied the statutory requirement for standing. Turning separately to the justiciability analysis, this court stated:

> "There are two aspects to the analysis of justiciability in this case. The first relates to the standing inquiry: will a decision have a practical effect on the rights of the parties? The second relates to ripeness: is this case brought prematurely?"

*McIntire*, 322 Or at 433. This court then noted:

> "This court recently has reiterated the standard for a justiciable controversy under Oregon law:
>
> " 'Under Oregon law, a justiciable controversy exists when "the interests of the parties to the action are adverse" and "the court's decision in the matter will have some practical effect on the rights of the parties to the controversy." *Brumnett v. PSRB*, 315 Or 402, 405-06, 848 P2d 1194 (1993).' *Barcik v. Kubiaczyk*, 321 Or 174, 182, 895 P2d 765 (1995)."

*McIntire*, 322 Or at 433-34 (footnote omitted). *Brumnett* and *Barcik* were mootness cases in which this court did not significantly address the distinct issue of standing. *McIntire* included a discussion of the practical effects requirement in the context of the standing inquiry, when, in fact, this court always has understood it to be an aspect of the mootness inquiry (except, of course, if a statute *itself* requires that a decision have a concrete impact on the rights of the person in order for him or her to have standing). The only pertinent inquiry into standing that the statute in *McIntire* occasioned was whether the petitioner was an "interested person." A practical effects requirement would have relevance to the standing issue in *McIntire* only as an aspect of the petitioner's showing that he was an "interested person." The court's comments about practical effects, in context, did not elevate that criterion to a constitutional component of standing.

The foregoing discussion demonstrates that the standing component in ORS 183.400(1) does not violate any limitation imposed by the Oregon Constitution. Petitioner satisfied that requirement. The Court of Appeals erred in concluding otherwise and dismissing the petition. On remand, the Court of Appeals must address the merits of the petition.

The decision of the Court of Appeals is reversed, and the case is remanded to that court for further proceedings.